ADDENDUM

## LATEX ALLERGY LITIGATION OVERVIEW

  A. Natural Rubber Latex Gloves

  Natural rubber latex gloves (sometimes NRL gloves) are used by millions of healthcare workers each year to defend against viruses and diseases such as HIV and hepatitis. Natural rubber latex is viewed as a material of choice for medical gloves because of its strong barrier qualities and tactile sensitivity.

  Healthcare workers have been using natural rubber latex gloves for decades. NRL is derived from the sap of the rubber tree whose scientific name is hevea brasiliensis. It is ubiquitous, both in medical and non-medical environments. It has been estimated that there are up to 40,000 different consumer products that contain NRL, including condoms, toys, tires, rubber bands, rubber balls, balloons, household and gardening gloves, pacifiers, racket handles, and sporting equipment.

  In 1987, due to increased concerns over AIDS and Hepatitis B, the Centers for Disease Control ("CDC") officially recognized the need for high quality barrier protection for healthcare workers and their patients to control the spread of these and other infectious diseases and blood-borne pathogens through a set of guidelines called Universal Precautions. OSHA implemented these guidelines by requiring the use of gloves made of material with the barrier protection qualities of NRL whenever a healthcare worker comes into physical contact with a patient or handles bodily fluids. This practice of "gloving" was mandatory.

  In approximately 1989, the FDA began receiving reports regarding possible NRL allergic reactions. As a result, on March 29, 1991, the FDA Commissioner's Office issued a Medical Alert to over one million healthcare workers and professionals in the U.S. referring to the increased reports of allergic reactions to NRL-containing medical devices and to reports of latex sensitivity in the medical literature. The FDA advised these healthcare professionals to identify their latex sensitive patients and be ready to treat allergic reactions promptly. Shortly after sending out this Medical Alert on March 29, 1991, the FDA circulated virtually the same information in its July, 1991 Medical Bulletin. The Bulletin was sent to over one million hospitals, doctors, nurses and other healthcare professionals. These recipients in turn re-copied these alerts and increased the circulation exponentially.

B. Allergy

The immune process (by which one acquires an allergy) and the spectrum of allergic symptoms is the same for all allergens whether they are fruit or pollen or grass or NRL or anything else. Therefore, it is appropriate to begin with an overview of allergy albeit with this caution: Allergy is a complex subject, every individual is unique and the state of knowledge is constantly evolving. The following is a brief overview.

1. IgE antibody - The immune cells responsible for Type I allergy

The immune system protects us from disease by creating antibodies which fight off and kill viruses and bacteria and other foreign (non-self) substances. The antibodies involved in allergy are called IgE antibodies. It is paradoxical that IgE, an antibody of the immune system designed to protect us, should be responsible for allergy. In evolutionary history, IgE antibodies developed as a specialist to fight worms and other parasites that found their way into the human body. In developed countries, where parasites have been virtually eliminated, IgE antibodies unfortunately turned to mischief, that is, causing allergy. In undeveloped countries, where IgE antibodies are still busy protecting humans against parasites, there is coincidentally very little allergy.

2. From sensitization to allergy

A process called "sensitization" must take place before one can become allergic (that is, express allergic symptoms). It is complex and beyond the scope of this overview. If sensitization occurs it results in the proliferation of IgE (immunoglobulin E) antibodies. Sensitization can be defined for our purposes as the presence of IgE antibodies specific to a particular allergen in a human's blood, as measured either by positive skin prick test or positive blood serum test.

It may take one or more re-exposures by the individual to the same allergen before sensitization occurs. It should be noted, however, that most humans are exposed to many kinds of allergens on a daily basis, yet never become sensitized. Even with the small percentage of humans who do become sensitized, the number of re-exposures before sensitization occurs varies, and there is no known threshold for sensitization to allergens. Moreover, many humans, despite being "sensitized" to an allergen (that is, having IgE specific to that allergen present in their blood), will never have an allergic reaction. However, a small percentage of humans, once sensitization occurs, may thereafter experience an allergic reaction after re-exposure to the allergen. That person is considered to have an allergy. Thus, allergy only occurs in humans who are hypersensitive to specific allergens. An allergic reaction can produce a variety of symptoms such as a rash, allergic rhinitis (runny nose), urticaria (hives) asthma and other symptoms. In sum, for "allergy" to occur in a human, there must, first, be exposure to an allergen; there must, second, be production of IgE specific to that allergen in the human's blood, and there must, third, be an allergic reaction by the human to a subsequent exposure to that allergen.

3.  Type I allergy v. Type IV allergy

Allergy is a hypersensitive (super sensitive) immune cell reaction to an otherwise benign or harmless substance. In fact, the type of allergic reaction we are concerned with here is called Immediate Type <u>Hypersensitivity</u> (ITH), Type I <u>Hypersensitivity</u> or IgE mediated hypersensitivity. The substances causing ITH for the most part are proteins such as those in dog dander or pollen. Not all proteins in dog dander or pollen or any other substance are capable of causing allergy. Allergenic proteins derived from plants and trees vary in their allergenicity depending, *inter alia*, on the season and growing conditions (*i.e.* amount of water). Most people won't react to allergens at all. A person can be allergic to one allergen and not to others. It is well recognized that allergy has a major genetic component and certain individuals tend to be allergic to many things. These people are called *atopics*.

The allergic symptoms of an ITH or Type I reaction can vary greatly depending upon the individual's susceptibility or predisposition to the specific allergen and the route of exposure (e.g., cutaneous, mucosal or respiratory). Symptoms can range from localized hives (urticaria) to more severe generalized urticaria. More severe reactions may include gastrointestinal and respiratory distress.

Many allergens look somewhat alike to the immune system. Thus, a person may be allergic to one allergen and then be exposed to another similarly configured protein to which they are not allergic, yet the body is fooled by their molecular similarity into reacting. This is known as *cross reactivity*. Some substances which are not allergens or cross-reacting allergens, say an ingredient in food (or a chemical in the air) may trigger a reaction resembling an allergic reaction (*i.e.*, a release of histamine, a substance which causes allergic symptoms). These are known as non-specific (non-allergenic) stimulators.

Besides Immediate Type Hypersensitivity (or Type I IgE mediated hypersensitivity) there are other types of allergy. One is called Delayed Type Hypersensitivity or DTH also known as Type IV hypersensitivity. They derive their names from the time it takes from exposure to reaction. A Type I allergic response usually occurs approximately 20 minutes after exposure whereas a Type IV reaction typically occurs 24-48 hours after exposure. DTH is caused by T cells whereas, as previously noted, ITH (or Type I) is caused by antibodies which are proteins made by B cells. T cells and IgE react to different allergens. The allergic reaction they cause can lead to both similar and distinct allergic symptoms. The Type IV reactions are usually confined to local areas (as compared to the sometimes more systemic Type I reaction) and may include redness, swelling or edema. Poison ivy is a classic example of a Type IV reaction.

There are also different diagnostic tests for the various types of hypersensitivity reactions. In the diagnosis of latex allergy, the first issue is whether individuals are sensitized, and then whether they have allergy at all and, if so, whether it is Type I or Type

IV. In these cases, all plaintiffs allege Type I immediate hypersensitivity.

### 4. Diagnosis of allergy

Diagnosis of allergy depends on positive lab (blood or *in vitro*) or skin (*in vivo*) testing for sensitization and a thorough history demonstrating verifiable exposure and timely expression of allergic symptoms. Since every person is continuously exposed to allergens from the time of birth, obtaining an accurate exposure history can be difficult. Exposures which do not result in allergic symptoms, including those which may be leading to sensitization, are perceived as harmless non-events and go unnoticed and unremarked. As noted, all ITH allergies cause the same symptoms and many allergic people are atopic meaning that they are genetically predisposed to become allergic, after exposure to allergens. Numerous exposures to allergens occur simultaneously. Further, many symptoms that humans experience are non-specific to allergy further complicating diagnosis. The tests for sensitization are also subject to false positive and negative results. False positives can be caused, among other things, by cross-reactions.

### C. Latex Allergies

Healthcare workers have reported two types of reactions to latex gloves which are unrelated to natural rubber proteins. The first type of reaction is irritant contact dermatitis (sometimes caused by constant hand washing) which is a non-allergic reaction that does not involve cells of the immune system. The second type of reaction is, as discussed above, allergic contact dermatitis or Type IV delayed hypersensitivity and refers to a local allergic reaction (similar to poison ivy) to the chemicals used in the manufacturing process. Both of these reactions can be confused with ITH skin symptoms.

### D. NRL Glove Litigation

The first product liability case alleging NRL allergy resulting from the use of NRL medical gloves was filed in or about 1991. Since that date, there have been hundreds of state and federal latex glove lawsuits filed.

The plaintiffs in these cases claim that they have developed NRL allergies from exposure to NRL medical gloves (or, more particularly, to certain potentially allergenic latex proteins in the gloves). Plaintiffs typically allege that, over time, they first become sensitized to NRL as a result of repeated exposure to NRL gloves. They also claim that they then experience allergic reactions on subsequent re-exposure to NRL gloves or other NRL products. In one case a plaintiff, who had never had a reaction to latex gloves alleged that an allergic reaction to a nectarine was really a "cross-reaction" to NRL. (*Bruggencate* identified in the chart *infra*). Some plaintiffs allege that they are so allergic to NRL that they can no longer work in the healthcare field due to the widespread use of NRL gloves and other latex products. Other plaintiffs have continued to work in

CH\15794\CH01\SUDZD/164875.1

healthcare, using non-NRL gloves, glove liners, or other accommodations. There are also allegations by some plaintiffs that as a result of their NRL allergy, they must avoid common household NRL-containing products and be vigilant for NRL products when they leave their homes.

Plaintiffs variously allege manufacturing and design defects and failure to warn theories. The defendant typically assert the following defenses: plaintiff does not have Type I NRL allergy; lack of general causation (i.e., that any exposure to NRL gloves caused injury to the plaintiff); lack of specific causation (which is the probability that the exposure to a particular defendant's gloves caused injury to the individual plaintiff); lack of product defect; education of healthcare workers regarding NRL allergies; assumption of the risk; comparative negligence; statute of limitations; state of the art; and, as in other allergies, the sufficiency of the labeling and plaintiffs' knowledge that they were using latex gloves.. Healthcare workers are sophisticated users and consumers of NRL gloves, and information about the perceived, developing latex allergy problem was communicated to them through many sources including FDA bulletins, nurse association communications, medical journals and various task forces formed by hospitals. Healthcare workers were also schooled on recognizing and dealing with NRL allergy because it was also an important element in providing adequate healthcare to patients. Moreover, in dealing with allergy issues, warnings on a product about the possibility of sensitization are not effective (*i.e.* cannot be heeded) because there is nothing that one can do until one knows one is actually allergic.

Trial History

As of October 1, 2005, there have been a total of seventeen (16) cases that have started trial. One case was settled during trial, one was dismissed by plaintiff after several trial days with no payment and there were fourteen (14) dispositions by jury verdict. One jury verdict for the plaintiffs was vacated by JNOV and affirmed on appeal. The current tally is eleven (11) dispositions in favor of the defense and four (4) for plaintiffs. Seven (7) of the last eight (8) trials have resulted in defense verdicts. The following chart sets forth the trial history:

| Plaintiff | State | Trial Date | Outcome |
|---|---|---|---|
| 1. Kummel v. Smith & Nephew | NJ | June 1997 | Defense verdict |
| 2. Green, et al. v. Smith & Nephew, et al. | WI | Feb. 1998 | Plaintiff Verdict |
| 3. Bruggencate v. Baxter Healthcare Corporation, et al. | CA | April 2000 | Voluntarily Dismissed with Prejudice in mid-trial |
| 4. McGinnis v. Baxter Healthcare Corporation, et al. | CA | June 2000 | Defense JNOV - Affirmed On Appeal |
| 5. Zarnosky v. Smith & Nephew | NJ | September 2000 | Defense Verdict |
| 6. Goolsby v. Baxter Healthcare Corporation | TX | March 2001 | Plaintiff Verdict |
| 7. Turacy v. Tradex Int'l., Inc. | OH | May 2001 | Defense verdict |
| 8. Gonoude v. Baxter Healthcare Corporation, et al. | PA | May 2001 | Settled at Trial |
| 9. Falcone v. Safeskin Corporation | PA | September 2001 | Plaintiff Verdict |
| 10. Steffen v. Johnson & Johnson, et al. | TX | October 2001 | Defense Verdict |
| 11. Langlois and Borazzas (consolidated) | NH | March 2002 | Defense Verdict (Both) |
| 12. Kennedy v. Baxter Healthcare Corporation, et al. | MN | April 2002 | Defense Verdict |
| 13. Patzek v. Aladan Corporation, et al. | PA | July 2002 | Defense Verdict |
| 14. Rourke-Nichols v. Baxter Healthcare Corporation, et al. | CA | October 2002 | Defense verdict |
| 15. Gilberti v. Touro Infirmary, et al. | LA | February 2003 | Defense verdict |
| 16. Sinrod v. Smith & Nephew, et al. | NY | September 2003 | Plaintiff verdict |

CH\15794\1CH01/SUDZD/164875.1

Remaining Discovery

Since 1991, hundreds of plaintiffs have filed latex glove cases in state and federal courts throughout the United States against many companies that have manufactured and distributed latex gloves during the past several decades. Inherent in each case are questions relating to product identification, presence or absence of Type I NRL allergy, specific causation, product defect, personal knowledge of the content of latex gloves, the need, if any, for information on the product label and damages. The bulk of discovery of these issues was left for post-remand discovery. Many of the verdicts were based on these case-specific issues.

The NRL glove litigation involves complex scientific and medical issues. Extensive case-specific expert testimony will be needed in each case. Other than general background testimony about NRL allergies and general medical and scientific research, most of the case-specific expert testimony will address the detailed medical and exposure history of each plaintiff in an effort to prove or disprove that the plaintiff has Type I NRL allergy at all (or that the plaintiff became sensitized as a result of exposure to defendant's latex gloves).

Post-remand discovery is also needed in order to focus on the identity of the latex glove products used by each plaintiff. (Each manufacturer offers a variety of models in the surgical and exam glove markets that vary as to color, feel, use of powder, use of synthetic materials, sterility, packaging and other characteristics). Such discovery must also address the plaintiff's medical history, records and tests to determine the presence or absence of allergy and the substances to which plaintiff is allergic.

Latex is commonly used in countless household products, not simply in the healthcare setting. This raises the possibility that NRL allergies (if any) were caused by other products and not NRL gloves. Also, allergic reactions may be caused by cross-reactivity between NRL proteins and other structurally similar allergens, for example, certain foods and grasses where the plaintiff is actually allergic to those substances and not to natural rubber. Depositions of non-party witnesses, including, but not limited to plaintiffs' co-workers and supervisors, need to be taken. These witnesses are crucial to product identification, causation and damage issues. Damage discovery is particularly important because plaintiffs sometimes claim inability to work or restriction from working in their profession. Discovery involves an exploration of damage mitigation issues and an investigation of accessible hospitals or other facilities since there are many institutions that provide NRL powder free and latex free environments.

In addition, most plaintiffs continue to seek treatment from healthcare providers and continue to change occupations. Thus, even in cases where some discovery has occurred, additional discovery is needed to obtain up-to-date medical, employment, insurance and tax information.

CH\15794\1CH01/SUDZD/164875.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of February, 2006, a true and correct copy of Revised Rule 26(f) Report was served via U.S. first class mail, postage pre-paid, upon the following:

Attention: Legal Department
Ultravena Industries
1500 River Pines Drive
Green Bay, WI 54311

Charles A. DeLuca, Esquire
R. Kelley Franco, Esquire
Ryan Ryan Johnson & DeLuca
80 4th St., P.O. Box 3057
Stamford, CT 06905

David B. Sudzus, Esquire
John Dames, Esquire
Lara Otsuka, Esquire
Drinker Biddle & Reath
115 S. LaSalle Street, 23rd Floor
Chicago, IL 60603

John A. Simon, Esquire
Gardner, Carton & Douglas
Quaker Tower
321 N. Clark Street
Suite 3400
Chicago, IL 60610

Lori S. Kahn, Esquire
Kardaras & Kelleher
40 Wall Street
New York, NY 10005-1303

Louise A. Kelleher, Esquire
Cooper Kardaras & Scharf
40 Wall Street
New York, NY 10005-1303

Robert K. Marzik, Esquire
1512 Main Street
Stratford, CT 06497

Karen Shichman Crawford, Esquire
Buchanan Ingersoll Professional Corp.
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219-1410

Marguerite S. Walsh, Esquire
Littler Mendelson
Three Parkway
Suite 1400
Philadelphia, PA 19102

Calum B. Anderson, Esquire
Danaher Lagnese & Neal, P.C.
Capitol Place
21 Oak Street, Suite 700
Hartford, CT 06106

Donald M. Lieb, Esquire
Otjen Van Ert Stangle Lieb & Weir
700 North Water Street
Suite 800
Milwaukee, WI 53202

Paul F. Lantieri, Esquire
Bennett Bricklin & Saltzburg
1601 Market Street, 16th Floor
Philadelphia, PA 19103

R. Cornelius Danaher, Jr., Esquire
Danaher, Lagnese & Neal, P.C.
Capitol Place
21 Oak Street, Suite 700
Hartford, CT 06106

Richard Walker, II, Esquire
Kelley Jasons Mcguire
Centre Square West
1500 Market Street
Suite 1500
Philadelphia, PA 19102

Debra Schwaderer Dunne, Esquire
Thorp Reed & Armstrong
One Commerce Square
2005 Market Street
Suite 2010
Philadelphia, PA 19103

Paul B. Kerrigan, Esquire
Reed Smith
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

*Ury & Moskow, LLC*

By: /s/ Neal L. Moskow
Neal L. Moskow, Esq.
Ury & Moskow, LLC
883 Black Rock Turnpike
Fairfield, CT 06825
Federal Bar No. ct04516
neal@urymoskow.com